FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA SEP -5 P 3 30
ALEXANDRIA DIVISION

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **East Coast Custom Coaches, Inc.**, and **Eduardo Bocock**,<br><br>Plaintiffs,<br><br>v.<br><br>**Ronald Lee Campbell**, and **Carrie Kelley**,<br><br>Defendants. | Case 1:14-cv-1155(LO-TCB)<br><br>Jury Demanded |

## COMPLAINT

1.      Plaintiffs EAST COAST CUSTOM COACHES, INC., a Virginia corporation, and

EDUARDO BOCOCK, individually and in his capacity as owner of EAST COAST CUSTOM

COACHES, INC., by their attorneys, McDermott Will & Emery LLP, as and for their complaint

herein, allege as follows:

### NATURE OF ACTION

2.      This action arises out of Defendant RONALD LEE CAMPBELL's ("Campbell")

and CARRIE KELLEY's ("Kelley") (collectively, "Defendants") scheme to defraud and

embezzle more than $1,000,000 from their former employer, Plaintiff EAST COAST CUSTOM

COACHES, INC. ("ECCC"), and ECCC's owner, Plaintiff EDUARDO BOCOCK ("Bocock")

over the course of their employment.

### THE PARTIES

3.      ECCC is a corporation organized under the laws of Virginia, with its principal

place of business in Manassas, Virginia.

4.      Eduardo Bocock is an individual, a citizen of Virginia, and a resident of Fairfax

County, Virginia.  Mr. Bocock is the sole owner of ECCC.

5.     Ronald Lee Campbell is an individual and a citizen of Virginia.  His last-known address is 5306 Saphair Court, Woodbridge, Virginia 22193.

6.     Carrie Kelley is an individual and a citizen of Virginia.  Her last-known address is 11205 Burnwell Road, Nokesville, Virginia 20181.

## JURISDICTION AND VENUE

7.     The Court has subject-matter jurisdiction over Counts 1 and 2 because they arise under the laws of the United States.  28 U.S.C. § 1331 (2012).  The Court has subject-matter jurisdiction over Counts 3, 4, and 5 because they form part of the same case or controversy as Counts 1 and 2 under Article III of the U.S. Constitution.  28 U.S.C. § 1367(a) (2012).

8.     The Court has personal jurisdiction over Defendants because Mr. Campbell and Ms. Kelley are citizens of and reside in Virginia.

9.     Venue is appropriate in this District because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in the Alexandria Division of the Eastern District of Virginia.  28 U.S.C. § 1391(b)(2) (2012); Local Civil Rule 3(C).

## FACTUAL ALLEGATIONS

### A.     ECCC Operations.

10.     ECCC is in the business of manufacturing, fabricating, and customizing trucks and trailers for corporate, government, and individual use.  Examples of such vehicles include luxury recreational vehicles ("RVs"), custom food trucks, and modified vehicles for state police, including K-9 Units, Brush Fire Units, and Mobile Command Trailers.

11.     ECCC issues checks solely for payroll, and only Bocock has authority to sign checks on behalf of ECCC.  Company credit cards are used to make all purchases on ECCC's behalf.  According to company policy, any purchases made using a personal credit card require prior approval by Bocock.

2

12.     ECCC keeps two sets of books for accounting. The first set, which is based on ECCC's bank records, is kept at the office of Bocock's Certified Public Accountant, "Complex Tax and Accounting, Inc.," located at 4330 Ridgewood Center Drive, Woodbridge, Virginia 22192. The second set of books, which is based on ECCC receipts, is located onsite at ECCC. The physical receipts are also kept onsite at ECCC in Manassas, Virginia.

**B.     Defendants' Employment With ECCC.**

13.     On or around May 2008, ECCC hired Campbell as a Shop Manager. On or around September 2011, ECCC hired Kelley to be ECCC's bookkeeper. In that capacity, Kelley was authorized to process payments to vendors and only approved reimbursements to employees.

14.     At no point during her employment with ECCC did Kelley have the authority to withdraw funds from any lines of credit or extensions thereof, or to create or increase lines of credit without Bocock's permission.

15.     During the period from April 2012 to January 2014, Kelley was the only ECCC employee other than Bocock with authority to use ECCC's bank account to make payments to vendors.

16.     On or around April 2012, ECCC promoted Campbell to General Manager.

17.     Campbell's job responsibilities as General Manager included managing ECCC's day-to-day operations, including overseeing and maintaining inventory, and communicating with clients and vendors.

18.     At no point during his employment with ECCC did Campbell have the authority to transfer or withdraw funds from any lines of credit, bank accounts, or extensions thereof, or to create or increase lines of credit, without Bocock's permission.

19.     On or around January 31, 2014, Kelley was terminated from ECCC's employment.

20.     On or around April 19, 2014, Campbell was terminated from ECCC's employment.

### C.     Campbell and Kelley's Payroll Fraud Scheme.

21.     Campbell and Kelley used ECCC's payroll system to steal funds from ECCC.

22.     Both Campbell and Kelley increased their respective salaries from ECCC, without asking or receiving permission from Bocock to do so, by falsely representing to PayChex (ECCC's payroll vendor) that Kelley was ECCC's business manager.

23.     Campbell and Kelley also inflated the number of hours they worked to increase their compensation from ECCC.  For example, between Christmas and New Year's Eve of 2013, ECCC compensated Campbell for 120 hours of work, even though Campbell did not actually work 120 hours during that period.

24.     Campbell and Kelley also placed Mr. Campbell's two sons, William and Joseph Campbell, on the ECCC payroll without authorization, causing ECCC to pay more than $6,000 to William and Joey Campbell for services that were never rendered.

### D.     Campbell and Kelley's Wire Fraud Using PNC Bank Account.

25.     As stated above, it is ECCC's policy that all expenses incurred by an employee must be pre-approved.

26.     Despite that policy, on multiple occasions throughout his employment, Campbell was reimbursed for expenses from ECCC that were never accrued.  To carry out this scheme, Campbell set himself up as a vendor on the "bill pay" function of ECCC's online banking with PNC Bank. *See* Exhibit 1.

27.     Upon information and belief, Kelley materially assisted Campbell with setting Campbell up as a vendor in the ECCC online banking system and facilitating payments to him related to transactions including but not limited to those that occurred on April 10, 2013, April 29, 2013, June 5, 2013, July 3, 2013, August 16, 2013 and October 8, 2013. *See* Exhibit 2.

**E.     Campbell's Wire Fraud Using Square Account.**

28.     On or around October 1, 2013, Campbell set up a personal credit processing account for himself using Square, a credit card processing company that utilizes smart phones in lieu of point-of-sale credit card swipe machines.

29.     Upon information and belief, the proceeds from credit card swipes using Campbell's personal Square account went directly into Campbell's personal bank accounts. *See* Exhibit 3.

30.     On multiple occasions between 2013 and 2014, Campbell utilized his personal Square account to make unauthorized "reimbursements" to himself, including but not limited to transactions occurring on October 1, 2013, December 6, 2013, December 16, 2013, and January 10, 2014.

31.     For instance, on or around December 6, 2013, Campbell swiped his ECCC company credit card using his personal Square account to pay himself $2,000 for an alleged reimbursement that was, in fact, not authorized by Bocock. *See* Exhibit 3.

32.     On or around December 16, 2013, Kelley issued Campbell a separate unauthorized "reimbursement" in the amount of $5,000. *See* Exhibit 3.

**F.     Theft of ECCC's Revenue.**

33.     On multiple occasions throughout his employment, Campbell solicited payments directly from ECCC's customers for services rendered by ECCC and retained such payments.

34.    For example, on or about January 2014, Campbell asked an ECCC customer, Kerron Roberts, to make a $25,000 payment directly to Campbell for ECCC's services. *See* Exhibit 4, Declaration of Kerron Roberts. While ECCC recovered that particular payment before terminating Campbell's employment, upon information and belief, Campbell engaged in similar fraudulent transactions a number of times prior to his attempted misappropriation of Mr. Roberts' payment, including but not limited to the following payments:

35.    On or about February 28, 2013, Campbell personally retained an $11,000 payment from an ECCC customer for a food truck buildout. *See* Exhibit 5.

36.    In or around April 2012, Campbell personally retained a $10,000 cash deposit from an ECCC customer for a $62,438.31 project. Campbell attempted to conceal his theft by reducing the price on the contract by $10,000 and pocketing the deposit. *See* Exhibit 6.

37.    On yet another occasion, Campbell instructed a customer to provide payment in the form of cash or check directly to Campbell in lieu of cutting checks to ECCC. Thereby, misappropriating another 10,000 deposit. *See* Exhibit 7 (Statement of Hussein Roughani).

38.    Upon information and belief, Campbell successfully utilized this same scheme on multiple occasions between 2012 and 2014, including but not limited to similar fraudulent transactions on April 12, 2012, May 24, 2012, July 7, 2012, February 28, 2013, and September 20, 2013. *See* Exhibit 8. On information and belief, Campbell personally retained at least $150,000 in downpayment proceeds for the sale of food trucks.

39.    In addition to the outright theft of down-payment proceeds, on information and belief, on multiple occasions between 2012 and 2014, Mr. Campbell misrepresented the price of base model trucks which ECCC acquired through intermediary vendors on behalf of its customers, in order to "skim" monies from the sale of those trucks. Specifically, Campbell over-

quoted the pre-buildout price for base model trucks, and pocketed the difference in the price charged by the truck vendor and his quoted price.

40.     In furtherance of his scheme to personally retain proceeds rightfully belonging to ECCC, Campbell even went so far as to change ECCC's form invoices sent to customers, as well as the ECCC website, to include his personal email address and personal phone number. Campbell was never authorized to do this.

**G.     Campbell's Theft of Company Assets and Credit Fraud "Ford F-150."**

41.     On or around October 2012, Campbell represented to Bocock that he wanted the company to purchase a "company vehicle" to pick materials and supplies, rather than rely on using his own personal vehicle. Bocock authorized Campbell to get a quote on such a vehicle.

42.     Instead, Campbell represented himself to the dealer as the "President of ECCC" and purchased a fully-loaded Ford F-150 outfitted with snow plow equipment for which ECCC had and has no use. The purchase price of the Ford F-150 was approximately $39,249.

43.     At no time was Campbell President of ECCC, nor did he ever have authority to sign as such, nor did he have authority to purchase the Ford F-150.

44.     Bocock did not learn of the purchase of the Ford F-150 until mid-2013 while reviewing company finances.

45.     Campbell and Kelley made the monthly payments on the Ford F-150 using company funds via EFT or telephoned payments.

**H.     Campbell's Theft of Company Assets and Credit Fraud "Gator."**

46.     From time to time, ECCC used a utility vehicle—known as a "Gator"—to recycle metal scraps and tow out-of-service trucks. On or around September 2012, Campbell represented to Bocock that it was necessary for ECCC's manufacturing and fabrication

7

operations to replace the existing Gator.  Campbell knowingly misrepresented to Bocock that the Gator was no longer functional.

47.     Despite Campbell's representations to the contrary, the existing Gator was fully functional at this time.

48.     On or around October 2012, based on Campbell's misrepresentation that the existing Gator was no longer functional, Bocock authorized Campbell to purchase a replacement Gator for the company.

49.     On or around October 31, 2012, Campbell used Mr. Bocock's existing personal revolving line-of-credit with John Deere to purchase a new gator.

50.     Campbell ordered the replacement gator outfitted with multiple optional features and accessories that were neither approved by Bocock nor reasonably necessary to the business of ECCC.  These options included, among other things: camouflage paint, a snow plow and snow plow mount, and a front brush guard.  Pictures of the second Gator are attached hereto as Exhibit 9.  The total price for the replacement Gator was $16,207.11. *See* Exhibit 9.

51.     At no time point did Bocock give Campbell permission to use any ECCC property for his personal use.

52.     Despite that, Campbell used the replacement Gator for his personal use.  For example, Campbell used the replacement Gator when hunting. *See* Exhibit 10.

53.     Campbell also used the replacement Gator and its snow plow accessories to run his own snow plow business.  For example, on or around December 10, 2013, Campbell closed the ECCC's storefront, allegedly due to inclement weather, and later charged ECCC for the cost of the Gator's fuel spent in the course of running his own personal snow plow business. *See* Exhibit 11.

8

54.     In or around 2013, Campbell also retained the benefit of twelve (12) generators he ordered from the company Cummins Onan, at the expense of ECCC, by opening a line of credit with Cummins Onan under ECCC's name in the amount of $120,000 to ship directly and invoice ECCC. At no point did Campbell have any authority to open lines of credit with vendors.

55.     Of the twelve generators Campbell took delivery of, only one was actually used in connection with ECCC business; the remaining eleven were retained by Campbell and used for personal projects for which only Mr. Campbell received a financial benefit. Moreover, Campbell was recorded by other ECCC employees removing ECCC generators from the premises on at least one occasion. *See* Exhibit 12.

**I.     Theft of ECCC Assets and Labor.**

56.     Mr. Lee Campbell rented an adjacent lot in the name of ECCC. This lot was paid for with ECCC funds. When Bocock inquired about the raise in rents, Campbell suggested that the additional lot was necessary to store customer's trucks. Upon investigation, Bocock learned that the additional lot was only used for two purposes: (1) storage of Campbell's personal property (one fishing boat, two motorcycles, two RVs, one trailer) and (2) the unauthorized sale of used food trucks that competed directly with ECCC's primary business of fabricating new food trucks.

57.     Campbell alone benefited from the sale of these used trucks.

58.     At all times herein, ECCC was not in the business of selling used food trucks. At all times herein, Campbell was not authorized to store his personal property on ECCC property.

59.     Additional lots were held by ECCC for the storage and repair of customer recreational vehicles. At all times herein, Campbell supervised the RV storage and repair business. On information and belief, Campbell offered RV customers "discounts" if payments

for RV repairs were made in cash. ECCC realized no income from the RV repair business despite employing a part-time employee that worked exclusively on RVs on site and repairs were conducted and paid for by customers.

60.     As a matter of company practice and policy, ECCC only uses new generators in the food trucks it fabricates. Around mid-April 2014, Bocock received a call from a customer related to his food truck generator. Upon investigation, Bocock discovered that the food truck generator installed in the customer's food truck had been used prior to installation. After questioning his employees, Bocock determined that Campbell had taken a used generator from another customer to install in place of the new generator. To cover up his fraud, Campbell changed the odometer on the stolen generator.

61.     Upon information and belief, Campbell took the new generator for his personal gain.

62.     Finally, upon information and belief, Campbell instructed his subordinate ECCC employees to build a "Hunting Blind" for his personal use, using ECCC's materials and supplies.

**J.      Credit Card Fraud.**

63.     Over the course of his employment, ECCC issued multiple company credit cards to Campbell for the purpose of purchasing equipment and inventory for use in ECCC's operations. Campbell was never authorized by ECCC or by Bocock to use a company credit card to purchase any personal items.

64.     Upon information and belief, Campbell and Kelley used an ECCC company credit card to purchase numerous personal items, such as automobile seat covers and a household washer and dryer.

65.     Upon information and belief, the total amount of personal items charged to ECCC's company credit card by Campbell and/or Kelley is approximately $150,000.

**K.     Sabotage.**

66.     Within a week following his termination, Campbell opened a competing truck fabrication and modification shop on the same block as ECCC, called S&L Customs.

67.     Campbell hired Kelley as his accountant for his new business.  Upon leaving ECCC, Campbell misrepresented to ECCC's existing customers that ECCC was going out of business and thereby stole many of ECCC's customers.  Campbell also represented that ECCC was going out of business to many of ECCC's manufacturer vendors.

68.     Upon information and belief, Campbell interfered with existing and future ECCC customer contracts during his employment with ECCC as General Manager, and hurt ECCC financially through his mismanagement of ECCC's customer accounts, its accounts receivable and also through his intentional mismanagement of capital expenditures with the intent of bankrupting or forcing ECCC to close down to pave the way for Campbell's own enterprise.

69.     Upon Campbell's departure from ECCC, Campbell contacted ECCC's customers via email and/or telephone and misrepresented to them that their truck warranties were only valid if the trucks were serviced at S&L Customs.  *See* Exhibit 13.

70.     Upon information and belief, Campbell contacted ECCC's advertisers and had them change ECCC's advertisements to advertisements for S&L Customs.  Upon information and belief, In addition to the outright theft of ECCC materials described above, Campbell is still trying to steal materials scheduled to be delivered to ECCC.  For example, as recently as August 19, 2014, a vendor for ECCC was instructed by Campbell to ship goods to S&L Customs's address, rather than to ECCC.  *See* Exhibit 14.  When ECCC was notified of the shipping address

11

change, ECCC contacted the vendor, who advised ECCC that they believed Campbell was still employed by ECCC. Upon information and belief, Campbell and Kelley presently continue to interfere with ECCC's existing business relationships.

## COUNT 1
### Violation of the Electronic Funds Transfer Act
### (15 U.S.C. §§ 1693 et seq.)

71.     Plaintiffs incorporate by reference paragraphs 1 through 70, inclusive, as though fully set forth herein.

72.     As a direct and proximate cause of Defendants' intentional and willful misrepresentation to ECCC vendor, Paychex, as described above, monies were stolen using the ECCC electronic payroll system.

73.     As a direct and proximate cause of Defendants' unauthorized use of ECCC lines of credit; as described above, monies were stolen using the credit card payment option attached to ECCC's various lines of credit.

74.     As a direct and proximate cause of Defendants' fraudulent use of the electronic payment feature of ECCC's PNC bank account, as described above, Plaintiff suffered substantial and unwarranted damages and loss of revenue.

75.     Plaintiff has suffered significant damage as a result of Defendants' unlawful manipulation of its electronic funds transfer systems.

## COUNT 2
### Civil Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. §§ 1962(a), (b), (c), and (d))

76.     Plaintiffs incorporate by reference paragraphs 1 through 75, inclusive, as though fully set forth herein.

77. Campbell and Kelley have been engaged in a pattern of racketeering activity as enumerated in 18 U.S.C. §§ 1964(a), 1964(c), 1965, and 28 U.S.C. § 1331, through the various schemes referenced above.

78. As a direct and proximate cause of Defendants' conspiracy to conduct the affairs of the enterprise through a pattern of racketeering activity, including the racketeering activity described in this Complaint, ECCC and Mr. Bocock have been injured in business and property in that they have been deprived of inventory, profits, and other monies. *See* 18 U.S.C. § 1964(c).

## COUNT 3
### Tortious Interference with Existing and Prospective Contracts

79. Plaintiffs incorporate by reference paragraphs 1 through 78, inclusive, as though fully set forth herein.

80. At all times herein ECCC had existing contracts and/or business relationships with a number of entities, including but not limited to, Guapo's on the Go.

81. At all relevant times, Defendants were aware of ECCC's contracts, relationships and expectancy with respect to these entities.

82. Defendants, in their individual capacities, intentionally, knowingly, wrongfully, and through their use of improper methods, including sabotage and intimidation interfered with ECCC's agreements and expectancy, and caused termination of certain of ECCC's business relationships.

83. The actions of Defendants were far outside the normally accepted practices of the competitive marketplace, and constituted tortious interference with ECCC's existing and prospective contract and business expectancy.

84.     As a direct and proximate result of Defendants' interference with ECCC's agreements and business expectancy, ECCC has suffered substantial harm, including lost profits, emotional distress, anxiety and other damages.

**COUNT 4**
**Fraud**

85.     Plaintiffs incorporate by reference paragraphs 1 through 84, inclusive, as though fully set forth herein.

86.     Defendants' conduct constitutes fraud under Virginia common law.

87.     Defendants knowingly made false statements of material facts to customers and vendors on a regular basis during the relevant time period of April 2012 to April 2014.

88.     Defendants' statements and claims described above contained promises, assertions, and representations or statements of fact that were untrue, deceptive, or misleading.

89.     Defendants' statements and claims described above had a tendency to deceive, or have deceived, their intended audience.

90.     Defendants' statements and claims described above are willful because Defendants made those statements and claims with the intent to deceive ECCC customers and vendors into paying monies to Defendants, including instead of directly to ECCC, and Defendants knew that the statements were false, misleading, or deceptive at the time that they made the statements or concealed material information.

91.     Defendants have been unjustly enriched as a direct result of their false, misleading, and deceptive statements and claims.

92.     ECCC and Mr. Bocock suffered actual economic injury as a direct and proximate result of Defendants' willful false, misleading, and deceptive statements of fact and claims.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

Therefore, Plaintiffs Bocock and ECCC demand judgment against Defendants awarding them the following:

a)    Compensatory and punitive damages in an amount no less than $1,000,000 against each Defendant, jointly and severally;

b)    Treble damages in accordance with law pursuant to 18 U.S.C. §§ 1962(a), (b), (c), and (d).

c)    Treble damages in accordance with law pursuant to Va. Code §§ 18.2-500;

d)    An injunction restraining Defendants from contacting existing ECCC customers for a period of two years or such time to be determined at trial;

e)    Punitive damages against each Defendant in the amount of $350,000 against each defendant, jointly and severally; and

f)    Any other relief as the Court deems just and proper, including interest, costs and attorneys' fees under the law.

Dated: September 5, 2014

Respectfully submitted,

Mary D. Hallerman (Va. Bar. No. 80430)
David O. Crump (to file *pro hac vice*
application)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
Email:  mhallerman@mwe.com;
dcrump@mwe.com
Telephone: (202) 756-8000
Fax: (202) 756-8087

*Counsel for Plaintiffs ECCC and Mr. Bocock*

16